IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TERRANCE KELLY,

                        Plaintiff,

        v.                              CASE NO. 05-3228-SAC

ROBERT SAPIEN, et al.,

                        Defendants.

**MEMORANDUM AND ORDER**

This is a civil rights complaint, 42 U.S.C. 1983, filed by an inmate of the El Dorado Correctional Facility, El Dorado, Kansas (EDCF). Plaintiff also filed an application for leave to proceed in forma pauperis, and has submitted the initial partial filing fee as directed. The court grants leave to proceed in forma pauperis[1].

**CLAIMS**

Plaintiff complains he is confined in administrative segregation (ad seg) as "Other Security Risk" (OSR) for "alleged violations", which he claims are only being "used" by prison officials "to justify their actions." He asserts prison regulations as well as his constitutional rights are being violated, in that he has been held in administrative segregation

_____

[1] Plaintiff is advised that he remains obligated to pay the balance of the statutory filing fee of $250.00 in this action. The Finance Office of the facility where he is incarcerated is directed by a copy of this order to collect from plaintiff's account and pay to the clerk of the court twenty percent (20%) of the prior month's income each time the amount in plaintiff's account exceeds ten dollars ($10.00) until the filing fee has been paid in full. Plaintiff is directed to cooperate fully with his custodian in authorizing disbursements to satisfy the filing fee, including but not limited to providing any written authorization required by the custodian or any future custodian to disburse finds from his account.

"for more than 500 days" without charges, disciplinary reports or an evidentiary hearing on the alleged violations. Plaintiff also argues that the restrictions and isolation of administrative segregation amount to "atypical and significant hardship" as well as cruel and unusual punishment. He names as defendants a member of his Unit Team, the Warden at EDCF, and the Kansas Secretary of Corrections. The court is asked to declare that his constitutional rights have been violated, order defendants fired, enjoin retaliation, and award money damages.

**FACTS**

As factual support, plaintiff alleges he was placed in "OSR" on April 21, 2003, while at the Hutchinson Correctional Facility, based on numerous allegations which are also reflected in an administrative review report attached to his complaint. He contends prison officials must not have proof of these allegations, since he has not been charged with disciplinary violations or crimes. Plaintiff's exhibit "Administrative Segregation Review (Pursuant to IMPP[2] 20-106), Monthly Review" indicates his "placement classification" was pursuant to "IMPP 20-104(I)(B)(13) Other Security Risk." The Review provides the reasons for his segregation placement as follows:

> Inmate Kelly is a validated member of the Security Threat
> Group "Brothers of the Struggle" "Folk Nation". He was
> placed in LTS at EDCF from LCF on 6/12/00, due to being an
> active leader of the "Folks" and his involvement in the
> planning of a disturbance that lead (sic) to unrest at LCF.
> He was released on 12/26/01 and was placed on Intensive
> Supervision. On                1/27/02, he was placed back in

---

[2]     KDOC Internal Management Policy and Procedure.

LTS, after being involved in a physical altercation in the
EDCF gym. The fight involved inmates going through a glass
window in the gym. Inmate Kelly was transferred to HCF/C on
1/17/03 and placed into general population on 3/31/03. He
was placed back in segregation on 4/21/03 after information
was received by the EDCF I&I unit that he was involved in
the attack on an inmate at EDCF. Inmate Kelly has been
communicating with other validated STG members housed at
other facilities. Inmate Kelly's active membership and
apparent leadership role or ability to give orders or
approve of actions by other STG members makes Inmate Kelly
a danger to the safety and security of any facility, and it
is recommended that he be transferred back to long-term
segregation at the earliest possible date.

This Review also indicates Kelly declined to comment. Return to

general population or change in status was not recommended.

Plaintiff cites[3] IMPP 20-104 (I)(B)(13) Other Security Risk,

which pertinently provides:

The Warden may place in administrative segregation . .
. any inmate . . . if the inmate . . . (has) engaged in
behavior which has threatened the maintenance of
security or control in the correctional facility.

Plaintiff cites IMPP 20-104(I)(B)(13)(a)(1) as providing that the

warden shall explain in writing the threat and show

justification. He then alleges "Something in wich (sic) was not

done nor is the wardens signature on any of the petitioner's ad

seg report." He also states he was not provided a hearing prior

to placement with opportunity to present objection or reasons

against the placement "because of the transfer to EDCF special

housing unit." He also alleges defendants "continue to add

unfounded reasons to justify their actions" according to the ad

seg report reviews received from the Board monthly. He alleges

_____

[3]

Plaintiff also quotes IMPP 20-104 (I)(B)(2)(b), which provides: "Any inmate held in administrative
segregation pending results of an investigation shall be charged or released within three working days . . . ."
However, it does not appear that plaintiff is being held pending investigation. Plaintiff also cites IMPP 20-
101(II)(A) regarding segregation under conditions of emergency; however, his own allegations and exhibits
indicate he is not being held in ad seg under this IMPP but as other security risk.

he has been "subjected to monthly admin seg review boards proceedings that are a sham," and that "over 700 days of unwarranted ad seg" violates due process and rises to the level of cruel and unusual punishment.

## LEGAL STANDARDS

It has long been held that the due process rights of prisoners are subject to reasonable limitation or restriction in light of the legitimate security concerns of a prison institution, Bell v. Wolfish, 441 U.S. 520, 546-47 (1979); and that courts accord substantial deference to prison administrators in handling matters of internal security. Rhodes v. Chapman, 452 U.S. 337, 349 FN14 (1981). It has also long been settled that inmates do not enjoy a constitutional right under the Due Process Clause to remain in the general population. Hewitt v. Helms, 459 U.S. 460, 468 (1983), *overruled in part on other grounds*, Sandin v. Conner, 515 U.S. 472 (1995); Bailey v. Shillinger, 828 F.2d 651, 652 (10th Cir. 1987); Templeman v. Gunter, 16 F.3d 367, 369 (10th Cir. 1994)(Inmates are not constitutionally entitled to any particular classification or degree of liberty while incarcerated, and therefore an inmate's placement in administrative segregation, standing alone, does not constitute a deprivation of liberty). Hewitt explicitly held "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration," and thus does not involve "an interest independently protected by the Due Process Clause." Hewitt, 459

U.S. at 468-69.  However, the Supreme Court also held that where state law creates a liberty interest in remaining free from conditions of administrative segregation, due process is implicated.  _Id_.  In order to be entitled to relief, plaintiff must show first that he has a constitutionally protected liberty interest in avoiding placement in ad seg at EDCF, and second that the process utilized to place and maintain him in ad seg did not satisfy constitutional requirements.  See _Wilkinson v. Austin_, ___ U.S. ___, 125 S.Ct. 2384, 2395 (June 13, 2005).


**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

A threshold, procedural question, which has arisen upon initial screening of the complaint, is whether or not plaintiff has exhausted administrative remedies on all the claims he raises before this court.  The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. 1997e(a).  Plaintiff is a prisoner confined in EDCF, and this is an action "with respect to prison conditions" brought under Section 1983.  The KDOC has provided a mechanism for administrative review[4], and under the PLRA plaintiff was obligated to use it before coming to federal court.

Plaintiff did not file his complaint on forms provided by the

---

[4] In addition to the regular inmate grievance procedure, IMPP 20-107(I)(A)(effective February 15, 2002) provides: Upon verbal request of any inmate in ad seg, an inmate request form and a writing implement with which to make a written complaint to the administrative segregation review board concerning the inmate's condition or treatment shall be provided to that inmate."

court.  He pleads with regard to exhaustion only that he filed a "form-9 seeking solution" and a grievance to U.T. Manager Sapien, and appealed the grievance response to the warden and the Secretary of Corrections.  Plaintiff's handwritten administrative grievance is exhibited as an attachment to his "KDOC Inmate Grievance Form," which refers to it for the specific "nature of complaint."  The initial response of the Unit Team[5] is also attached to this form and restates plaintiff's complaint that he has been in ad seg for 23 months and has "not received the opportunity to vindicate" himself against "some allegations" made by the I&I.  The attached response of Warden Roberts to plaintiff's appeal of his grievance concurs with the initial response without discussion of the issues raised, and the attached "Grievance-Response of Appeal" is a denial of Kelly's appeal to the Secretary of Corrections.  Plaintiff's appeal to the Secretary claimed only that the Warden did not adequately investigate his grievance.  Plaintiff also exhibits only one of the monthly "Administrative Segregation Review" reports, which appears to be dated December 13, 2004.

Plaintiff's exhibits do not show he grieved specific claims in his complaint including that there is no evidence supporting

---

[5] On April 8, 2005, the Unit Team responded in part:

Your placement into administrative segregation is based on information gathered by I and I that you communicated with other known security threat group inmates, which indicates you have an active membership and apparent leadership role or the ability to give orders concerning the attack of another inmate.  This behavior indicates a threat to the safety and security of the facility.

In accordance with IMPP 20-104 there does not have to be a disciplinary report written to substantiate placement in administrative segregation.  The investigation by I and I is sufficient for placement.

the stated reasons for his segregation, that disciplinary reports should have been written within 48 hours, that he was initially placed in ad seg under emergency status and is being improperly continued in that status, that the warden did not "explain in writing the threat" which caused him to be held in ad seg as other security risk and "show justification" as required by prison regulations, that the warden's signature does not appear on any of plaintiff's ad seg reports, that he was not provided with a hearing prior to his initial placement in ad seg with an opportunity to present objections, that defendants "continue to add unfounded reasons to justify their actions" and that he could not possibly pose a threat to EDCF after 24 months in ad seg.  It also does not appear that plaintiff has complained in an administrative grievance that monthly reviews of his segregated status are a "sham."  He also does not show that he filed an administrative grievance claiming prison officials are not following particular regulations, as he conclusorily claims, or that the many restrictive conditions of ad seg described in his complaint are atypical as well as cruel and unusual.  Instead, it appears from plaintiff's exhibits that the only factual bases he presented in his administrative grievance was that he was denied the process due in disciplinary matters, such as the timely filing of disciplinary reports and an evidentiary hearing to vindicate himself.

The court concludes that, even though plaintiff filed and appealed an administrative grievance seeking his removal from ad seg, neither the complaint nor the record submitted by plaintiff provides information sufficient to satisfy the exhaustion

requirement under a new opinion of the Tenth Circuit Court of Appeals. <u>Simmat v. Unites State Bureau of Prisons</u>, ---F.3d---, at \*22 (10th Cir. July 1, 2005). The Tenth Circuit emphasized in <u>Simmat</u> that, "Exhaustion is a pleading requirement rather than an affirmative defense," and "failure to adequately plead exhaustion therefore amounts to a failure to state a claim upon which relief can be granted." <u>Id</u>. at \*25, *citing* <u>Steele v. Fed. Bureau of Prisons</u>, 355 F.3d 1204, 1210 (10th Cir. 2003), <u>cert</u>. <u>denied</u>, 125 S.Ct. 344 (2004). They noted when a prisoner fails to state a claim, the PLRA requires the court to dismiss the complaint sua sponte:

> The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions . . . if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

42 U.S.C. 1997e(c)(1).

Plaintiff has attached copies of the dispositions of his administrative grievance, but those documents reveal he presented only a couple of the numerous allegations he makes in his complaint. Consequently, an administrative record has not been fully developed, and the KDOC has not had the opportunity to correct any errors with regard to the procedures utilized in plaintiff's initial ad seg placement, the alleged problems with the monthly board reviews, plaintiff's challenges to the reasons for his placement and retention in ad seg, and the many conditions of which he complains in ad seg. <u>See</u> <u>Simmatt</u>, ___ F.3d at \*24.

This court concludes plaintiff has not sufficiently pled exhaustion of administrative remedies on the majority of his claims.  Morever, even if plaintiff has sufficiently pled exhaustion with regard to a few of his claims, it has recently been held that "the PLRA contains a total exhaustion requirement." <u>Ross v. County of Bernalillo</u>, 365 F.3d 1181, 1188-89 (10th Cir. 2004) (When multiple claims have been joined, all available prison grievance remedies must be exhausted as to all of the claims, and the presence of unexhausted claims in a complaint requires the district court to dismiss the entire action without prejudice).  Plaintiff shall be given time to supplement his complaint with proof that he has exhausted administrative remedies on all his claims.  If he fails to sufficiently plead total exhaustion, this court will be required to dismiss the complaint without prejudice for failure to state a claim.

<u>**DISCUSSION OF SUBSTANTIVE CLAIMS**</u>

The court also finds, upon initial screening, that the complaint is subject to dismissal for failure to state a claim on which relief may be granted due to the lack of legal merit of some of plaintiff's claims and his failure to state sufficient facts in support of other claims.  The court recognizes that a "pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.  <u>Haines v. Kerner</u>, 404 U.S. 519 1972); <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the court cannot assume the role of advocate for the pro se litigant, and

a broad reading of the complaint does not relieve the plaintiff of the burden of alleging sufficient facts to state a claim on which relief can be based. <u>Id</u>. (Conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based).

## VIOLATION OF KANSAS ADMINISTRATIVE REGULATIONS

To the extent plaintiff seeks relief for alleged violations of state statutes or Kansas prison regulations, he states no cognizable claim under Section 1983. <u>Gaines v. Stenseng</u>, 292 F.3d 1222, 1225 (10th Cir. 2002); <u>see Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150 (1970); <u>Hill v. Ibarra</u>, 954 F.2d 1516, 1520 (10th Cir. 1992). To state a 1983 claim, a plaintiff must allege a deprivation of a federally protected right under color of state law. <u>See Malek v. Haun</u>, 26 F.3d 1013, 1015 (10th Cir. 1994); <u>Hovater v. Robinson</u>, 1 F.3d 1063, 1068 FN4 (10th Cir. 1993)(The "failure to adhere to administrative regulations does not equate to a constitutional violation."). Thus, plaintiff may not prevail simply by proving the violation of administrative regulations; rather, he must establish the loss of a constitutionally protected interest.

## DENIAL OF PROCESS DUE IN DISCIPLINARY PROCEEDINGS

Plaintiff's main claim in his complaint, that he was denied the due process required in disciplinary proceedings, has no legal merit. He complains he was segregated from the general population without the issuance of disciplinary reports or an evidentiary hearing. Kansas prison regulations plainly allow

non-punitive as well as punitive segregated confinement. Where the segregated confinement is the result of disciplinary action, it is considered punitive; and inmates are entitled to recognized, minimum procedural process under the United States Constitution. <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974). Where the segregated confinement is non-punitive, it is authorized for the administrative purposes[6] specified in Kansas prison regulations.

Clearly plaintiff is in non-punitive segregation, and therefore was not entitled to the due process mandated for disciplinary proceedings under <u>Wolff</u>. <u>See</u> <u>Walling v. Slusher</u>, 976 F.Supp. 1402, 1405 (D. Kan. 1997). Prison officials' administrative response to that effect was in accord with prison regulations governing "other security risk" placement in ad seg, and applicable federal law regarding ad seg. Thus, denial of administrative relief on this particular claim was reasonable, and it fails to state a 1983 claim. The court concludes plaintiff's placement in ad seg without being charged with crimes or disciplinary offenses and without a disciplinary hearing, even taken as true, does not state a claim and must be dismissed.

**LIBERTY INTEREST**

---

[6] IMPP 20-104 (effective as amended 7/21/04) "SEGREGATION: Purpose of Administrative Segregation & Appropriate Placements," requires the establishment of procedures "for the control of inmates for necessary administrative purposes other than punishment." It sets forth the "reasons and conditions" under which inmates may be confined in administrative segregation and the criteria used. These include protective custody, pending investigation, pre-hearing detention, to prevent disruption or collaboration among inmates, to prevent communicable disease, to monitor inmates with a history of aggressive sexual attacks, suicidal tendencies or other mental problems, for "consistent bad behavior," as "holdovers," and as "Other Security Risk." IMPP 20-104(I)(B).

The court liberally construes plaintiff's complaint to allege denial of the process due in connection with his placement and extended retention in administrative segregation. Plaintiff implies he has a right to be free of administrative segregation protected by Due Process. Plaintiff maintains that mandatory language in Kansas prison regulations created a liberty interest in his being free from ad seg absent due process, and that conditions of his confinement in ad seg at EDCF are "atypical" and therefore implicate due process. Having thoroughly considered plaintiff's allegations, the court finds he has not stated sufficient facts to establish a liberty interest.

On numerous occasions the courts in this district have found that Kansas prison regulations on segregation do not contain mandatory language which creates a protected liberty interest. See Rush v. McKune, 888 F.Supp. 123, 125 (D.Kan. 1995); Lloyd v. Suttle, 859 F.Supp. 1408, 1410 (D.Kan. 1994); Dotson v. Maschner, 764 F.Supp. 163 (D. Kan. 1991); cf., Abbott v. McCotter, 13 F.3d 1439 (10th Cir. 1994) (Utah regulations concerning administrative segregation did not create liberty interest; regulation allowing segregation "when circumstances make it necessary" did not so limit authorities' discretion as to create liberty interest). In any event, the U.S. Supreme Court has made it clear that after Sandin, "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'." Like the Supreme Court in Hewitt, the Tenth Circuit has

12

explicitly held that "the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Penrod v. Zavaras, 94 F.3d 1399, 1406 (10th Cir. 1996) (*quoting* Hewitt, 459 U.S. at 468); see also Everson v. Nelson, 941 F.Supp. 1048, 1050 (D.Kan. 1996) (placement of inmate in segregation for allegedly requesting sexual favors from other inmates not violation).   Administrative detention implicates constitutional due process only if the confinement is "the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." McDiffett v. Stotts, 902 F.Supp. 1419, 1426 (D.Kan. 1995) (*quoting* Sandin, 515 at 485); Speed v. Stotts, 941 F.Supp. 1051, 1055 (D.Kan. 1996) (*citing* Sandin, 515 U.S. at 486).

Plaintiff alleges his confinement in ad seg amounts to "significant deprivation" in that he has been denied participation in required programs, intramural sports, track and field events, weight lifting programs, table games, concerts and seminars, mental health programs, a food purchase program available to general population inmates, music activities, and work assignments.  He also alleges in a conclusory fashion that he is being denied access to free association and religious worship, a library with a large selection of legal and non-legal reading materials, a prison law clerk, high levels of incentive pay, Kansas Correctional Industries Employment wages, and having personal photos taken.  He complains he is allowed only 5 hour-long periods of recreation weekly while population gets 7 ninety-

minute periods, and to bathe and shower only 3 days a week while population can shower every day.  He further complains he is subjected to yelling at all hours since it is the only way to communicate and is exposed to inmates throwing urine, food, and feces, because several are mentally ill.  He also claims he faces "potential exposure" to HIV, hepatitis ABC and other diseases.

However, plaintiff does not allege sufficient facts indicating that the conditions in ad seg at EDCF are "atypical." In Sandin, the Supreme Court compared the conditions imposed on inmates in disciplinary segregation with the conditions in administrative segregation and protective custody.  Gaines, 292 F.3d at 1225, (citing Sandin, 515 U.S. at 486).  They instructed that a court must have evidence of the degree and duration of the plaintiff's restrictions, as compared to typical inmates, in order to adequately determine whether confinement has created an "atypical, significant hardship."  Id. at 1226.  The Tenth Circuit Court of Appeals, is among the majority of circuits which, when assessing whether conditions of disciplinary segregation pose an atypical and significant hardship under Sandin, have principally compared the challenged conditions to those of administrative segregation and protective custody within the same prison.  See Perkins v. Kansas Dept. of Corrections, 165 F.3d 803, 808 (10th Cir. 1999) (quoting Sandin, 515 U.S. at 484)(under Sandin the "key comparison" is between disciplinary and nondisciplinary segregation); Sandin v. Conner and Intraprison Confinement: Ten Years of Confusion and Harm in Prisoner Litigation, 45 BCLR 423, 441 (March, 2004), citing

14

<u>Gaines</u>, 292 F.3d at 1225-26 *and* <u>Johnson v. Bureau of Prisons</u>, No. 99-3239-KHV, 2000 WL 574881, at *4 (D.Kan. Apr. 4, 2000, unpublished). Plaintiff does not allege facts establishing that the conditions in ad seg at EDCF are more restrictive than other forms of incarceration, segregation in particular, in Kansas.

Moreover, contrary to plaintiff's claim, regulations governing conditions in segregation units within the KDOC indicate conditions in ad seg are typical. KDOC Internal Management Policy and Procedure (IMPP) Section Number 20-105(IV)(A) provides that "Each inmate in administrative segregation shall be treated as nearly as possible like any other inmate in the general population of the institution or facility" and "shall retain such privileges and property as are commensurate with the particular circumstance or condition for which the inmate was placed in ad seg." IMPP 20-105 (IV). IMPP 20-101 (SEGREGATION: Minimum Standards for the Operation of Segregation Units)(Effective 07-21-03) establishes "minimum standards" with regard to the operation and maintenance of segregation units within KDOC facilities. It provides minimum standards for "the manner in which inmates are fed, clothed, housed, and dealt with on a daily basis." It mandates that its provisions "shall apply to disciplinary and administrative segregation alike." It provides for "food from the normal diet of inmates not in segregation;" cells, whenever possible, "at least as large as other cells in the institution" which are adequately lighted during daylight hours; all "necessities of civilized existence" including toilet, bedding and water; the

opportunity to shave and shower at least 3 times per week; exchange of clothing, bedding and linen, and hair care "as frequent and of the same quality as for the general population;" and clothing that is not degrading and basic personal items. IMPP 20-101(I)(A)&(B). It also provides that an "inmate's right to communicate with an attorney or a person or agency designated to receive complaints shall not be interfered with," and for "access to legal and reading materials." It additionally provides for access to medical services and medications. IMPP 20-101(II). Inmates in segregation are to be provided "the same opportunities for writing and receiving letters" as the general population. Visitation and telephone privileges are "allowed on a restricted basis." The IMPP also provides that "each inmate confined in disciplinary and administrative segregation shall be allowed to exercise outside the cell" for at least one hour per day at least five days a week, and, weather and staff permitting, exercise outdoors. Generally, segregation inmates are to be provided "adequate exercise to maintain health." IMPP 20-101(III). Administrative segregation inmates are also to be provided with "reasonable access to programs and services" including "educational services, commissary services, library services, social services, counseling services and religious guidance." IMPP 20-101 IV(A).

Even though plaintiff points to greater restrictions on some activities in ad seg than in general population, the court concludes there are insufficient factual allegations in the complaint to suggest that the deprivations alleged in this case rise to the level of atypical or significant hardship, such that

they involve a protected liberty interest rather than a normally expected incident of confinement.  See Penrod, 94 F.3d at 1399; cf. Amos v. Nelson, 923 P.2d 1014, 1018-22 (Kan. 1996)(conditions in ad seg at EDCF examined and found not significant, atypical hardship).

**VIOLATION OF PROCESS DUE**

Even if Due Process is implicated by plaintiff's administrative segregation, plaintiff has not alleged facts sufficient to indicate it was violated.  An inmate placed in administrative segregation must have received notice of the reasons for his placement and state officials need only have conducted an informal, nonadversary review of the information supporting the inmate's confinement, including whatever statement plaintiff wished to submit.  See Wilkinson, 125 S.Ct. at 2397 (Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in Greenholtz and Hewitt provide the appropriate model); Hewitt, 459 U.S. at 472, 476. Hewitt, cited with approval in Wilkinson, contained no requirement that an evidentiary hearing be held to determine the credibility of the information relied upon by prison officials in making security classifications and specifically noted that a prisoner who has not engaged in improper activity may still be deemed a security risk and placed in administrative segregation. Hewitt, 459 U.S. at 474.  The informal review need not occur before placement in ad seg, but within a reasonable time

afterward.  Id. at 472, 476.  If the confinement in ad seg is lengthy, Hewitt suggests periodic review of the inmate's status is required.  Id. at 477 FN9.

Plaintiff's own exhibits and version of events indicate he has received fairly detailed notice of the reasons for his placement in ad seg, a review was held, and he was given the opportunity to present his views but declined.  Plaintiff also indicates his status has been reviewed on a regular basis.  Thus, even if plaintiff could prove that his due process rights are implicated by his placement and retention in ad seg, his own factual allegations indicate he has received the process due.

The recent opinion of the U.S. Supreme Court in Wilkinson is instructive.   In Wilkinson, the Supreme Court considered conditions at Ohio State Prison, the only supermax facility in Ohio, and found they were "more restrictive than any other form of incarceration in Ohio."  Wilkinson, 125 S.Ct. at 2389.  They opined that incarceration at OSP is "synonymous with extreme isolation," but noted in particular two "atypical" conditions -- inmates placed at OSP lose their eligibility for parole while there, and their placement is for an indefinite time limited only by their sentence.  The Supreme Court  held that "under any plausible baseline" conditions at OSP created a liberty interest in freedom from placement at OSP.  Id. at 2394.  The Supreme Court then proceeded to determine what process was due and whether it had been provided.  In doing so, they discussed Ohio's published procedures for determining placement at OSP in detail.  They cited the new policy at OSP as providing more guidance regarding the factors to be considered in placement

18

decisions and affording more procedural protection against erroneous placement than the old. Id. at 2390. They set forth how the prison policy "appeared to operate" from their construction of its text and the arguments of the parties. They found the Ohio policy provided for notice to the inmate of the reasons for classifying him to OSP and an opportunity to be heard, but not witnesses. Id. They stated requiring "officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason," and requiring a "short statement of reasons" safeguards against arbitrary decisionmaking and provides the inmate a basis for objection on review. Id. at 2396. The upheld Ohio policy also provided "multiple levels" and subsequent review of decisions recommending OSP placement.

The Supreme Court in Wilkinson noted that the State's interest in prison management was "a dominant consideration." They discussed prison security as

> imperiled by the brutal reality of prison gangs . . .
> . Clandestine, organized, fueled by race-based
> hostility, and committed to fear and violence as a
> means of disciplining their own members and their
> rivals, gangs seek nothing less than to control prison
> life and to extend their power outside prison walls
> (cite omitted). Murder of an inmate, a guard, or one
> of their family members on the outside is a common form
> of gang discipline and control, as well as a condition
> for membership in some gangs (cite omitted).

Id. at 2396.

The regulations governing administrative segregation in effect at EDCF and throughout the KDOC, on their face also

provide adequate process for placement in administrative segregation adequate to safeguard any liberty interest an inmate may have in not being assigned to ad seg at EDCF. IMPP 20-105 (effective as amended 8/21/04), "SEGREGATION: Basic Operations of Administrative Segregation," provides that all placements in ad seg must be approved by a shift supervisor of the segregation unit manager, and the shift supervisor is to forward a written report to the warden before the end of the shift. Every inmate placed in ad seg must receive a medical/mental evaluation as soon as possible after placement. If an emergency situation does not exist or immediate placement is not necessary, "inmates placed in seg shall be provided with a hearing prior to placement in order to provide them with an opportunity to present objections, explanations or reasons as to why such a placement should not be effected." IMPP 20-105(I)(B). IMPP 20-105(II) requires that an "administrative-segregation report" be completed in all cases indicating "specifically, the reason for placing the inmate in ad seg." IMPP 20-105(III) requires written notice to the inmate of the reasons for the placement "stated in sufficient detail to allow the inmate to understand the reasons and to make a response to them." IMPP 20-106 (effective as amended 7-21-04) provides review of administrative segregation placement by an "Administrative Segregation Review Board" (Board). The Board, appointed at each facility by the Warden and consisting of one person each from the security, clinical, and classification staffs, "shall hold an initial hearing to review the placement decision" within 3 working days of an inmate's initial placement in ad seg. The inmate is to be interviewed by the Board and

given the opportunity to present his or her case.   IMPP 20-106(I)(A)&(B).  Under IMPP 20-106(II)(A) the Board "shall review the status of each inmate confined in ad seg once per week for the first thirty days, and once per month thereafter."  If the Board recommends retention in ad seg, it must be by unanimous vote and it is the final action for that review period.  Otherwise, the Board may recommend to the warden in writing that the inmate be returned to general population, or transferred to another facility.   The inmate may submit written requests for release to the Board.  IMPP 20-106(II)(D).   IMPP 20-107(I)(B) provides that the warden or a member of the staff which reports directly to the warden "shall make a weekly on-site spot check, interviewing at least two inmates, to determine compliance with institution and department policy, rules and regulations."  Id. at (B).  A log is to be kept of the inmates interviewed and the staff member checking.   Under IMPP 20-106(III) the program management committee of each facility must review "those inmates maintained continuously in ad seg at least every 180 days."  The warden is to annually submit "a report to the Deputy Secretary for Facilities Management for all inmates continuously held in ad seg for a year or longer, and on each anniversary thereafter." Id., (IV).

The court may presume that defendants followed their published procedures in plaintiff's case unless and until plaintiff specifies which of these procedures were not followed. Since plaintiff mainly claimed entitlement to procedures for disciplinary segregation, he has not stated facts indicating that the procedures either in Wilkinson or the Kansas Administrative

Regulations governing administrative segregation were denied.  If plaintiff alleged facts tending to demonstrate that the KDOC policies do not, in practice, operate as indicated and that the process constitutionally required for ad seg was not provided, then he might state a claim for relief.   The duration of plaintiff's administrative confinement can be a significant factor.  However, extended duration alone does not dominate the court's consideration in this case, in light of prison officials' repeated periodic assessment that plaintiff has remained a security risk, the serious nature of the security threat posed by plaintiff, and the deference to be afforded the security assessment of individual inmates by prison administrators.  <u>See</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 321-22 (1986).  The placement in administrative segregation of members, particularly leaders, of an unsanctioned prison group responsible for prison violence is obviously rationally related to the legitimate goal of ensuring prison security.  <u>See</u> <u>Sandin</u>, 515 U.S. at 482-83, (federal courts must "afford appropriate deference and flexibility to state officials trying to manage a volatile environment").

In sum, plaintiff has not alleged facts establishing either that he enjoys a liberty interest to avoid placement in ad seg at EDCF, or that his initial placement in ad seg and his continued segregated confinement are not in compliance with applicable state regulations, which on their face provide adequate due process.


**<u>EIGHTH AMENDMENT VIOLATIONS</u>**

Plaintiff similarly fails to adequately plead exhaustion of

22

his claim of cruel and unusual conditions in ad seg, and to allege sufficient facts to state an Eighth Amendment violation. He does not allege facts indicating deprivations in ad seg are "sufficiently serious" to amount to cruel and unusual punishment or that particular defendants knew and disregarded excessive risks to his health or safety resulting from such restrictions. Farmer v. Brennan, 511 U.S. 825, 834-37 (1994); Perkins, 165 F.3d at 890; Rush, 888 F.Supp. at 125. Plaintiff's broad allegations of cruel and unusual punishment fail to identify any specific risk of harm.

For all the foregoing reasons, the court finds that the complaint is conclusory and fails to state an adequate claim. Plaintiff shall be given time to amend his complaint to allege sufficient facts in support of his constitutional claims.

**IT IS THEREFORE BY THE COURT ORDERED** that plaintiff's motion for leave to proceed in forma pauperis (Doc. 2) is granted. Collection action shall continue pursuant to 28 U.S.C. 1915(b)(2) until plaintiff satisfies the $250.00 filing fee.

**IT IS FURTHER ORDERED** that plaintiff is granted twenty (20) days to supplement his complaint to show total exhaustion of administrative remedies and to amend his complaint to state a claim. Failure to file a timely response may result in the dismissal of this action without further notice.

Copies of this order shall be transmitted to plaintiff and to the Finance Office of the facility where he is incarcerated.

**IT IS SO ORDERED.**

Dated this 21st day of July, 2005, at Topeka, Kansas.

s/Sam A. Crow
U. S. Senior District Judge